IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In Re:                                    )
                                          )
MARCUS L. EDWARDS and                     )
ANJELL H. EDWARDS,                        )        Case No. 12-00603-TOM-7
                                          )
        Debtor.                           )

---

## MEMORANDUM OPINION AND ORDER

This bankruptcy case is before the Court following the June 29, 2012 hearing on the Bankruptcy Administrator's Motion to Dismiss or Convert the case to one under chapter 13 with the Debtors' consent. Appearing before the Court were David Murphree, counsel for the Debtors; Jon Dudeck, counsel for the Bankruptcy Administrator; and the Debtors. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[1] This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(A).[2] This Court has considered the pleadings, arguments of counsel, the Debtors' testimony and the law, and finds and

---

[1] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[2] 28 U.S.C. §157(b)(2)(A) provides as follows:

> (b)(2)Core proceedings include, but are not limited to–
> (A) matters concerning the administration of the estate[.]

concludes as follows.[3]

## FINDINGS OF FACT[4]

Both of the Debtors in this case are employed in the education field within the public school system. Mrs. Edwards serves as the Assistant Principal of Erwin Middle School in Center Point, Alabama and has done so for the past year. She has been employed with Jefferson County Schools since 1996. Mrs. Edwards financed her undergraduate studies at the University of Alabama through student loans and received her undergraduate degree in Political Science in 1989. She does not know the exact amount of student loan debt attributable to this undergraduate degree but estimates it at $80,000. After receiving her undergraduate degree Mrs. Edwards continued her education, financing her studies with additional student loans. From 1995 through 1996 she attended Samford University and obtained a Masters degree; although she does not remember how much the tuition was at the time, she estimates it was around the same as it is now, or $1800 per semester. In order to obtain a pay raise, Ms. Edwards then continued her education at the University of Montevallo, receiving an Educational Specialist degree in 2000. She is currently attending Samford University again to obtain her Doctor of Education degree. Mrs. Edwards testified that she earns a salary of $74,000 per year which she believes will increase by $5,000 per year when she finishes her current course of study.

Mr. Edwards has been the Assistant Principal at Shades Valley in Irondale, Alabama for eight

---

[3] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to contested matters in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Bankruptcy Procedure 9014.

[4] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

years. He has also taught history and served as a football and basketball coach. Mr. Edwards did not incur any student loan indebtedness while working toward his undergraduate degree at Wiley College in Texas. His first student loan, in the approximate amount of $30,000, was obtained during his course of study for a Masters degree at Oklahoma City University. Mr. Edwards is currently attending the University of Montevallo working toward his Educational Specialist degree and has borrowed $10,000 in new student loans to finance his education. Based on Schedule I of the Debtors' bankruptcy petition, Mr. Edwards has a current salary of approximately $75,200 and may receive a raise of $2,000 per year when he obtains this degree. Because Mr. Edwards is still in school he is not making payments on the recent $10,000 student loan at this time, and he does not know what the payment terms will be when he finishes school and begins to repay the loan.[5]

Except for the very recent $10,000 obtained by Mr. Edwards to attend the University of Montevallo, Debtors' student loans have been consolidated into one loan in the approximate amount of $200,000, to be repaid with 7.5% interest per year through monthly payments of $1,236.89 for 25 years. The consolidated loan includes a substantial amount of interest which accrued during the times the loans were in forbearance because the Debtors could not make payments. Mrs. Edwards believes that approximately $20,000 of the consolidated student loan debt was incurred by Mr. Edwards and the remaining debt was incurred by her. For reasons that are not clear, only Mrs. Edwards is obligated on the consolidated loan.

The Debtors married in 1998 and purchased their first house in 2000 for approximately $119,000. In 2005 the Debtors purchased the home in which they now live for approximately

---

[5] Although no testimony was offered as to the amount of tuition for him to obtain this degree, the Court assumes it will not exceed the current tuition of $1,800 per semester for Mrs. Edwards at Samford.

3

$299,900. According to the HUD-1 Settlement Statement[6] provided to this Court the purchase was financed through a first mortgage loan in the amount of $239,900 and a second mortgage loan in the amount of $44,450.64. The next year Debtors decided to consolidate some of their debt and refinanced their second mortgage loan (the "2006 second mortgage") in the form of a "125 loan" (a loan with a 125% loan-to-value ratio) in the amount of $125,000.[7] The loan proceeds were used to pay off the existing second mortgage, credit card balances, personal loans, and a car loan, with $6,274.25 going directly to the Debtors. Currently, the balance owed on the first mortgage is approximately $220,000.00 and the second mortgage $125,000.00. Mortgage payments are $1,753 and $834, respectively. Mr. Edwards testified that they cannot sell the home and obtain cheaper housing because the debt secured by the home is in excess of the home's value. According to Mrs. Edwards's testimony the current appraised value of the home is $260,000.

There are other debts that the Debtors incurred around the time or after they purchased the house. Debtors borrowed $6,000.00 to furnish the new house. When Mrs. Edwards's brother experienced some kind of hardship the Debtors borrowed $8,000.00 to help him, and he has not repaid the money. The Debtors also purchased late model cars for each of them. Mrs. Edwards drives a 2011 Hyundai Elantra purchased in March 2011 when she began to have problems with her 1996 Mazda. Debtors originally financed $19,592.18 for the vehicle, and the current balance is approximately $17,516, to be repaid with 8.75% interest through monthly payments of $352.01.

---

[6] See FN 7.
[7] At the hearing the Court asked counsel for the Debtors to provide a list of the bills that were being consolidated with the proceeds of the second mortgage, to be marked as Court's Exhibit 1. The Debtors' counsel thereafter provided the Court and counsel for the Bankruptcy Administrator the HUD-1 Settlement Statement from the original purchase of the home (pages 1 - 2 of Exh. 1) as well as the Uniform Residential Loan Application from the 2006 second mortgage (pages 3 - 7 of Exh. 1) that set out the debts being consolidated.

4

There are about 60 monthly payments still due.[8] Mr. Edwards drives a 2010 Nissan Frontier pickup; he previously drove a 2002 Ford Explorer. Debtors originally financed $34,280.88 for the vehicle, and the current balance is approximately $23,600, to be repaid with 2.9% interest through monthly payments of $520. Debtors still owe approximately 47 payments.[9] The Debtors are unable to carpool or ride together to work because they have different schedules due in part to Mr. Edwards's additional duties and responsibilities. Thus, they require two reliable vehicles.

Mr. Edwards testified that around 2008 the Debtors consolidated some of their bills through Freedom Debt Relief, a debt consolidation agency, and while the consolidation helped a little, Debtors ultimately could not make the payments and thus filed this chapter 7 case.

The Debtors believe repayment of the student loans is necessary to prevent the creditor from garnishing their wages. They know of no alternative to paying the loans. Counsel for the Bankruptcy Administrator noted that the Debtors, as educators, may be eligible for a student loan forgiveness program for those who work in public service.[10] However, Mrs. Edwards testified that because payments under the public service forgiveness plan are income-contingent, the payment amount under that plan would be about the same as it is now.

## CONCLUSIONS OF LAW

The Bankruptcy Administrator seeks dismissal or conversion[11] of this case on the grounds

---

[8] *See* Reaffirmation Agreement between Debtors and Wells Fargo Dealer Services (Proc. 13).

[9] *See* Reaffirmation Agreement between Marcus Edwards and Nissan Motor Acceptance Corporation (Proc. 12).

[10] According to BA's Exhibit 1, Federal Student Aid Loan Forgiveness for Public Service Employees, student loan debtors employed in public service jobs may receive forgiveness of the remainder of their student loans after making 120 payments under certain repayment plans.

[11] Section 707(b)(1) provides in part:

5

that granting chapter 7 relief would be an abuse of the provisions of chapter 7 according to the test set out in section 707(b). The Debtors, however, assert the existence of "special circumstances" that would rebut the presumption of abuse and allow Debtors to proceed under chapter 7. The Court must determine (i) if special circumstances exist pursuant to section 707(b)(2)(B)(i) to rebut the presumption of abuse, and if so, (ii) whether the case should still be dismissed, or converted with the Debtors' consent, for abuse pursuant to section 707(b)(3) as having been filed in bad faith or considering the totality of the circumstances.

## SECTION 707(b) GENERALLY

According to the legislative history of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress was concerned with ensuring that debtors who had the means to pay at least a portion of their debts did so:

> "It is the strong view of the Committee that the bankruptcy code's generous, no-questions-asked policy of providing complete debt forgiveness under chapter 7 without serious consideration of a bankrupt's ability to repay is deeply flawed and encourages a lack of personal responsibility."

*In re Champagne*, 389 B.R. 191, 197 (Bankr. D. Kan. 2008) (*quoting* S. Rep. 106-49, at 3 (1999) (available at 1999 WL 300934)). Thus, Congress included in section 707(b) a provision allowing

---

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

Thus, upon a finding that granting relief in this case would be an abuse of the provisions of chapter 7, this Court may convert this case to chapter 13 only with the Debtors' consent; absent consent this Court may only order dismissal of the case.

6

a bankruptcy court to dismiss or convert a case when granting relief would be an abuse[12] of the provisions of chapter 7. *See* § 707(b)(1). According to section 707(b)(2)(A)(i):

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of--
> (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $7,025, whichever is greater; or
> (II) $11,725.

This formula has been incorporated into Bankruptcy Form 22A, Chapter 7 Statement of Current Monthly Income and Means Test Calculation, more commonly known as the "means test," which must be completed by every debtor filing a chapter 7 bankruptcy case.

**A. SPECIAL CIRCUMSTANCES**

Congress recognized the need to avoid "rigid and arbitrary application"[13] of the means test and thus included in the statute a provision allowing debtors to demonstrate "special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative" as a means of rebutting the presumption of abuse. 11 U.S.C. § 707(b)(2)(B)(i). Congress further recognized that not all financial hardships should constitute special circumstances:

---

[12] Before the 2005 BAPCPA amendments § 707(b) provided that a court may dismiss a case on a finding of "substantial abuse." The BAPCPA amendments removed the word "substantial" so that the statute now provides a case may be dismissed upon a finding of "abuse." Some courts have interpreted this as a broader, more inclusive standard consistent with legislative history. *See In re Henebury*, 361 B.R. 595, 609 (Bankr. S.D. Fla. 2007) ("If anything, BAPCPA's statutory modifications render it easier for a movant to establish abuse."); *In re Bookmyer*, No. 10-35913-BKC-RBR, 2011 WL 6202893, at *2 (Bankr. S.D. Fla. Apr. 14, 2011).

[13] *In re Sanders*, 454 B.R. 855, 860 (Bankr. M.D. Ala. 2011).

7

> [A] debtor who requests a special circumstances adjustment is requesting preferential treatment when compared to other consumers, and it is those other consumers who, by paying their debts, must assume the cost of the debts discharged by the debtors seeking preferential treatment. In order to ensure fairness ... it is essential that the 'special circumstances' test establish a significant, meaningful threshold which a debtor must satisfy in order to receive the preferential treatment.

S. Rep. No. 106-49, at 7 (1999). *See also In re Stocker*, 399 B.R. 522, 532 (Bankr. M.D. Fla. 2008).

In this case, although the Debtors do not dispute the Bankruptcy Administrator's conclusion that the presumption of abuse exists, Debtors assert as rebuttal that their student loan payments should be considered special circumstances and thus deducted on the means test. Courts have taken several approaches with regard to whether the repayment of student loans may be appropriately considered special circumstances. In *In re Haman*, the debtor, a cosignor on her son's student loans, began making payments after her son developed psychological disorders. *In re Haman*, 366 B.R. 307 (Bankr. D. Del. 2007). She claimed the student loans were special circumstances and the court agreed. Being "mindful that it must interpret the special circumstances exception so as not to frustrate the purpose of BAPCPA" the court noted:

> "[The special circumstances exception] should be strictly construed so as to coerce the higher income debtor in a Chapter 13 proceeding to adjust his living expenditures to an acceptable level. It should not be viewed as a panaceanic [sic] pathway by which a higher income debtor may achieve the justification of excessive spending patterns which created the necessity to seek Title 11 relief."

*Id*. at 314 - 15 (Bankr. D. Del. 2007) (*quoting In re Sparks*, 360 B.R. 224, 230 - 31 (Bankr. E.D. Tex. 2006)). Because the student loan debt was nondischargeable and the debtor had no reasonable alternative to paying the debt, the court concluded that the debtor had demonstrated special circumstances. *Haman*, 366 B.R. at 315, 318.

In contrast, it has been held that the nondischargeability of student loans is, by itself, not

8

enough to consider them special circumstances. In holding that the debtor's student loans did not qualify as special circumstances, the court in *In re Champagne* reasoned that "if Congress intended to allow inclusion of all student loan expenses when calculating disposable income for purposes of the means test, it would have said so." *In re Champagne*, 389 B.R. 191, 200 (Bankr. D. Kan. 2008). The court noted congressional intent to ensure that debtors who could pay a meaningful amount to their unsecured creditors did so, but also noted that "Congress enacted the special circumstances exception whereby the court may allow additional expenses, where the debtor has no reasonable alternative." *Id*. at 202. Thus, the court was unwilling to conclude that student loan payments could never qualify as special circumstances. The court in *In re Pageau* likewise concluded that the debtor's student loan could not be considered special circumstances, but instead of considering the nondischargeability of the loan the court considered why the debtor incurred the debt in the first place:

> In this Court's view, the Debtor's Student Loan should not be included as an additional expense on the Means Test Form. The examples in § 707(b)(2)(B)(i), which provide guidance as to what may constitute special circumstances, do not identify specific expenses, but rather identify some circumstances that give rise to such expenses. . . . It is not the obligation to repay a loan itself that qualifies such an expense as a special circumstance under § 707(b)(2)(B)(i), but rather it is the circumstances that lead to incurring a loan that must be special and justify the inclusion of this additional expense item in the means test, as long as the debtor has no reasonable alternative but to make monthly payments on such loan. . . . For that reason, the Court shall focus on the reasons the Debtor borrowed money for her education and incurred the Student Loan debt.

*In re Pageau*, 383 B.R. 221, 228 (Bankr. D.N.H. 2008). The court noted that according to the record the debtor incurred the debt in the course of her education and not for any special circumstances. *Id*. at 230.

One bankruptcy court has recently summed up the positions taken by other courts with regard

9

to whether student loan payments could be special circumstances rebutting the presumption of abuse. In *In re Sanders*, the debtors were responsible either directly or as guarantors for their son's student loans in the amount of $236,675.25, with monthly payments of $2,041.61. *In re Sanders*, 454 B.R. 855, 856 - 57 (Bankr. M.D. Ala. 2011). The bankruptcy court identified three approaches taken by courts addressing this issue. In the first group are cases holding that student loans could never be special circumstances because such an expense must be "reasonable and necessary," resulting from a "situation that is extraordinary, outside the control of a debtor, or always unanticipated." *Id.* at 857 (*citing In re Siler*, 426 B.R. 167, 172 (Bankr. W.D.N.C. 2010)). That student loans are nondischargeable is not by itself a sufficient reason to consider the loans special circumstances. *Sanders*, 454 B.R. at 857 - 58. In the second group are cases in which the courts recognized student loans could be special circumstances, but were not in the particular cases before those courts because the debtors claimed only a general inability to pay their expenses, or because the procedural requirements of the statute had not been met. *Id*. at 858 (*citing In re Womer*, 427 B.R. 334, 336 (Bankr. M.D. Pa. 2010) and *In re Fonash*, 401 B.R. 143, 148 (Bankr. MD. Pa. 2008)). In the third group of cases courts held that student loans could be special circumstances:

> [D]epending on the facts, student loan repayments can constitute special circumstances. *See In re Haman*, 366 B.R. 307 (Bankr. D. Del. 2007); *In re Templeton*, 365 B.R. 213 (Bankr. W.D. Okla. 2007); *In re Delbecq*, 368 B.R. 754 (Bankr. S.D. Ind. 2007); *In re Knight*, 370 B.R. 429 (Bankr. N.D. Ga. 2007). These courts reasoned that "'special circumstances' requires a 'fact-specific, case-by-case inquiry into whether the debtor has a meaningful ability to pay his or her debts in light of an additional expense or adjustment to income not otherwise reflected in the means test calculation.'" *Knight*, 370 B.R. at 437 (citing *Delbecq*, 368 B.R. 758 - 59). To these courts, a special circumstance is one that if the additional expense is not taken into consideration it creates a "demonstrable economic unfairness" that prejudices the debtor. *Id*. at 437 - 38.

*Sanders*, 454 B.R. at 858. Courts in the third group considered that the statute itself requires that

Case 12-00603-TOM7    Doc 27    Filed 07/25/12    Entered 07/25/12 15:14:24    Desc Main
Document    Page 10 of 18

the debtor have no reasonable alternative to incurring the expense. *Id*. at 859. In deciding to follow the third group of cases, the *Sanders* court looked to the legislative history of section 707(b)(2)(B):

> The Committee believes that the relief sought by a debtor who files for bankruptcy is financial in nature and the debtor's right to obtain preferential relief under the special circumstances provision should be assessed based on financial considerations only. In addition, special circumstances adjustments must not be used as a convenient way for debtors to choose a more expensive lifestyle. The special circumstances provision must be reserved only for those debtors whose special circumstances require adjustments to income or expenses that place them in dire need of chapter 7 relief.

*Id*. at 860 (*quoting* S. Rep. No. 106-49, at 7 (1999)). Looking only at financial considerations to determine whether the debtors had a dire need for chapter 7 relief or were attempting to fund a more expensive lifestyle, the court noted that the debtors' had a monthly disposable income of $1,196.91 and a monthly student loan payment of $2,041.61, that the debtors' son could not have made the student loan payments on his own, and that a forbearance or deferment of the loans while the debtors were in chapter 13 would only increase the student loan indebtedness. The court concluded that the debtors had met their burden of demonstrating special circumstances for which they had no reasonable alternative but to pay. *Sanders*, 454 B.R. at 862.

This Court agrees with the court in *Sanders* that in some cases, even applying a strict construction of the statute, student loan payments may constitute special circumstances depending on the facts of each case. In the case before this Court, the facts do not make the student loans "special." Special circumstances could include expenses that are unexpected, unforeseen, unavoidable, outside of the control of the debtors, or in some situations when incurred for others. Here, the Debtors created their financial situation or dilemma by several actions: incurring a large mortgage indebtedness for the purchase of their home when they already had credit card debt,

11

personal loans, and student loans; incurring simultaneously a furniture debt to furnish the home; continuing to incur student loan debt; and loaning money they did not have to a family member. They then deepened their financial troubles when they increased the mortgage indebtedness by admittedly borrowing more than the home was worth to pay off credit card debts and a vehicle. This debt consolidation did not improve the Debtors' situation in part because even after paying off their debt, they clearly continued to use and incur credit card debt that accrued interest. It appears that either Debtors used their credit cards to supplement their income and for expenses or for purchases. All of this indicates that the Debtors were not living within their means - they were spending more than they could pay.

In addition, the Debtors could have purchased less expensive vehicles. The Court notes that the Debtors had been driving older cars and when trading them in the Debtors did not purchase top-of-the-line or luxury vehicles in their place. However, purchasing two vehicles with payments totaling $872 per month at a time where they were already experiencing financial hardships indicates that Debtors continued to make poor financial decisions and were not ensuring they could pay their debt.

Furthermore, both Mr. and Mrs. Edwards continue to go to school and Mr. Edwards at least continues to incur student loan debt. As of the hearing, he had borrowed an additional $10,000 student loan to obtain another degree. It appears from the testimony that the loan amount exceeds the tuition at Montevallo.[14] This Court cannot help but infer that the additional money from this recent loan as well as the student loans over the years has been and is being used to help fund

---

[14] Based on this Court's assumption that the tuition is no more than $1,800 per semester, this amount provided additional income to Debtor even after purchases of books.

12

Debtors' living expenses. It is admirable that the Debtors seek to obtain multiple degrees, and that both teach and work in the "public" sector; however, most of their additional degrees have not been obtained in order to keep a job but to receive pay increases, and it is questionable whether given the Debtors' situation the incremental pay increases have justified the additional loans.

The Court recognizes that in today's economy most college graduates have student loans and many have difficulty repaying them. There could be facts under which the difficulty in repaying the loans would rise to the level of special circumstances such that the payments should be taken into account on the means test. However, student loans will not count as special circumstances where the debtors have borrowed funds in excess of the value of their home and have incurred debts for two vehicles while knowing they have substantial student loan debt. Essentially Debtors owe almost $600,000 in mortgage debt (about $341,000[15]), car loans ($41,000[16]) and student loan debt ($200,000), a sum that they should have known was excessive. Student loans will also not be special circumstances where the debtors have not made an effort to live more modestly or have not made financial sacrifices in an effort to repay their debts on their own or through a chapter 13 case. The Debtors in this case have not proposed to surrender their house, and according to Schedule J, have made little or no reductions in their expenses, despite the fact that according to the expenses reflected on Schedule J, they do not have sufficient income to pay the mortgages, car loans, student loans, and regular monthly expenses. Thus, the Debtors have failed to establish facts demonstrating their entitlement to preferential treatment. Debtors are public school employees - an admirable career, but not an entitlement to a chapter 7 given the financial circumstances they have imposed on

---

[15] *See* Debtor's Schedule D.
[16] *See* Reaffirmation Agreements (Proc. 12 and 13).

13

themselves. Under the facts of this case, the Court finds that the Debtors have not proven special circumstances that would allow their student loan payments to be considered additional expenses for the means test.

## B. TOTALITY OF THE CIRCUMSTANCES

The Bankruptcy Administrator additionally seeks dismissal or conversion of this case due to the totality of the circumstances test found in section 707(b)(3), which provides:

> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider--
> . . .
> > (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

In *In re Cribbs* the United States Trustee argued that the bankruptcy case should be dismissed pursuant to the totality of the circumstances test because the debtors could afford to pay almost $7,000 on their unsecured debts in a chapter 13. *In re Cribbs*, 387 B.R. 324, 331 (Bankr. S.D. Ga. 2008). The court identified six factors to consider in making its determination as to whether the debtors' chapter 7 filing was an abuse:

> (1) Whether the bankruptcy filing was precipitated by an unforeseen calamity, such as a sudden illness or unemployment;
> (2) Whether the debtor is eligible for chapter 13 relief;
> (3) Whether the debtor has made any efforts to repay his debts or negotiate with creditors; whether there are non-bankruptcy remedies available to the debtor; or whether the debtor can obtain relief through private negotiations;
> (4) whether the debtors could provide a "meaningful" distribution in a chapter 13 case;
> (5) whether the debtor's expenses could be reduced significantly without depriving them and their dependents of necessities including whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition;

14

(6) the period of time over which the debts were incurred[.]

*Id*. at 335. The court concluded that even though the debtors could repay at least some of their debt in a chapter 13, the majority of the factors indicated the debtors were not abusing the chapter 7 process and therefore denied the United States Trustee's Motion to Dismiss.

In the case before this Court, there are several factors in the totality of the circumstances test that weigh toward a finding of abuse. In addition to the *Cribbs* factors, this Court believes one additional factor should be considered: whether a chapter 7 discharge will provide the Debtors with the fresh start that is the goal of bankruptcy. Although the testimony and evidence do not reflect a bad faith filing, the Court must consider the totality of the Debtors' circumstances. The Debtors have not been forced into a bankruptcy filing due to an unforeseen calamity but instead, like many others, find themselves here at least in part due to bad financial decisions. The Debtors are eligible for a chapter 13 and, according to the Bankruptcy Administrator's calculations, could repay a substantial amount to their unsecured creditors. The Debtors did attempt to manage some credit card bills by incurring a second mortgage on their home but it was not long before they had once again incurred substantial credit card debt. A significant factor the Court must consider is the Debtors' ability and willingness to reduce their expenses without depriving them or their children of necessities. Debtors have a net income of approximately $8,500. Their mortgage payments consume 30% of the net income. Debtors pay $626 per month for utilities and cable, $870 per month for food, $1,100 per month for transportation expenses, $872 per month for vehicle payments and $400 per month for life insurance. At the very least the cable and life insurance expenses could be reduced. The biggest expense which Debtors have the potential to reduce is the monthly mortgage payment. The Debtors propose to reaffirm their mortgage debt even though they owe over $341,000 on a home

15

with a scheduled value of $285,300.[17] It is understandable that Debtors want to live in a nice house but it is not reasonable for them to pay $2,500 per month - or 30% of their net income - for a house that is so far "underwater." According to the Uniform Residential Loan Application that has been provided to the Court, the Debtors owed about $100,000 in student loan debt in 2006 when the second mortgage loan was refinanced, resulting in an increase in the second mortgage from approximately $44,000 to $125,000, and the student loan debt is now over twice the amount it was at that time.

Another relevant consideration is Debtors' recent purchases of two vehicles. Mrs. Edwards traded in a 1996 Mazda for a 2011 Hyundai Elantra, originally financing $19,592.18. The current balance of $17,516 is to be repaid with 8.75% interest through monthly payments of $352. Mr. Edwards replaced a 2002 Ford Explorer for a 2010 Nissan Frontier crew cab, originally financing $34,280.88. The current balance of $23,600 is to be repaid with 2.9% interest through payments of $520 per month. The Court understands that Debtors traded in or replaced older vehicles, and that the vehicles could not be classified as "luxury," but the monthly payments are significant considering the Debtors' tight budget. Further, they have four years of payments still due on one vehicle and five years on the other. Yet another consideration is the Debtors' loan of $8,000 to Mrs. Edwards's brother, and while this was a nice gesture, the loan was not a good financial decision. It certainly was not fair to Debtors' creditors.

The Debtors make roughly $150,000 per year. According to Schedule I Debtors' take-home pay is $8,492 per month, and per Schedule J they pay monthly expenses - not counting payments on

---

[17] Although the schedules show this value, Mrs. Edwards testified the value is $260,000; thus, they owe between $55,000 to $80,000 more on this house than its value.

unsecured debts - in the amount of $8,595. If Debtors receive a chapter 7 discharge they will rid themselves of approximately $22,000 in unsecured debt (primarily credit card debt but not counting student loans) according to Schedule F, but in this Court's view it is not the dischargeable debt that is their problem. Since Debtors are reaffirming their mortgages and car loans, their monthly expenses will not change even if they receive a chapter 7 discharge. Income of $150,000 per year is not enough to service almost $600,000 in mortgage, vehicle, and student loan debt. The numbers simply do not work.

Furthermore, the Debtors consolidated/paid off several debts by refinancing their second mortgage. Yet, since that time, they have incurred additional credit card debt that is now due on top of the consolidated debt. It appears that the Debtors are caught in a cycle of incurring new debt as soon as the old debt is managed in some way. This is a cycle that cannot be broken by discharging their unsecured debt, and chapter 7 is not the answer for the Debtors. Perhaps if Debtors had taken steps to adjust their expenses, i.e., cutting out cable and reducing cell phone expenses, finding less expensive housing, etc., chapter 7 might be a viable solution. However, under the facts of this case where the Debtors are making no lifestyle changes to live within their means, even if they were permitted to proceed in a chapter 7, they clearly cannot afford the remaining debts; thus it would be an abuse of the provisions of chapter 7 to allow Debtors to receive a chapter 7 discharge.[18] The Debtors, even though perhaps unintentionally, created their financial dilemma and a chapter 7, in this Court's view, would not resolve their financial woes nor would they receive a fresh start.

---

[18] In addition, a chapter 7 discharge could leave the Debtors in a worse position than they are in now. If the Debtors reaffirm their mortgage debt and eventually lose the home anyway, they could be responsible for a large mortgage deficiency that cannot be discharged in another chapter 7 for eight years, and they might be unable to deal with that deficiency in a chapter 13.

17

Because the Debtors have not rebutted the presumption of abuse, and considering the totality of the circumstances, the Debtors' chapter 7 case is due to be dismissed or converted to a chapter 13. Therefore, it is ORDERED, ADJUDGED, and DECREED that the Bankruptcy Administrator's Motion to Dismiss is GRANTED unless the Debtors file a notice of conversion to chapter 13 within fourteen days of the entry of this Memorandum Opinion and Order.

Dated: July 25, 2012

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm

xc: David Murphree, counsel for Debtors
     Jon Dudeck, counsel for the Bankruptcy Administrator
     Andre M. Toffel, Chapter 7 Trustee

18